USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/16/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

MICHAEL BLAYLOCK,  :

        Plaintiff,  :  **OPINION**

    - against -  :  06 Civ. 4387 (DC)

CORRECTIONAL OFFICER BORDEN, SGT.  :
SWANSON, DR. SUPPLE, and JANE DOE,
                              :
        Defendants.
                              :
- - - - - - - - - - - - - - - - - -x

**APPEARANCES:**    MICHAEL BLAYLOCK
                       Plaintiff Pro Se
                       Arthur Kill Correctional Facility
                       2911 Arthur Kill Road
                       Staten Island, NY 10309

                       ANDREW M. CUOMO, Esq.
                       Attorney General of the State of New York
                       Attorney for Defendants
                           By: John E. Knudsen, Esq.
                       120 Broadway
                       New York, NY 10022

**CHIN, District Judge**

       In this prisoner civil rights case, pro se plaintiff Michael Blaylock alleges that defendants Barry Borden, John Swanson, John Supple, and Jane Doe -- all employees of the New York State Department of Correctional Services ("DOCS") -- deprived him of his constitutional rights by failing to protect him from an attack by another inmate, acting with deliberate indifference to his medical needs, and causing him to be wrongfully disciplined.

       Defendants move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, the motion is granted.

## BACKGROUND

### A. Facts

The facts are drawn from the complaint,[1] affirmations, exhibits, and plaintiff's deposition testimony. For purposes of this motion, the facts are construed in the light most favorable to plaintiff as the party opposing summary judgment, and conflicts in the evidence have been resolved in his favor.

Plaintiff was incarcerated in Housing Unit 21, also known as the "Honor Unit," at Fishkill Correctional Facility ("Fishkill"). (Compl. ¶ 8; Borden Affirm. ¶ 2; Blaylock Dep. 24:10-25:5). On the evening of February 4, 2005, plaintiff had an argument with inmate Omar Douglas over the volume of the television in the Honor Unit's recreation room. (Blaylock 1).[2] Following the argument, plaintiff left the recreation room and returned to his cell. (Id.; Swanson Affirm. ¶ 5). Shortly thereafter, Douglas retrieved a seventeen-inch metal pipe from the recreation room's gym area and proceeded to walk towards plaintiff's cell. (Blaylock 1; Swanson Affirm. ¶ 5).

En route, Douglas passed Officer Barry Borden, then seated at his desk approximately twenty-five feet from plaintiff's cell. (Compl. ¶ 9; Borden Affirm. ¶ 3). At the time, Borden was updating the "log book" and did not stop Douglas

---

[1] Although plaintiff's complaint is not verified, the Court gives him the benefit of the doubt and, for the purpose of this motion, treats the complaint as an affidavit.

[2] Documents cited as "Blaylock (page number)" are bate-stamped pages drawn from Knudsen Decl. Ex. E.

or make any attempt to prevent him from reaching plaintiff's cell. (Compl. ¶¶ 10, 26; Borden Affirm. ¶ 3). Plaintiff was standing outside his cell door and "eased back" into his room when he noticed Douglas down the hallway. (Blaylock Dep. 77:13-24). Douglas entered plaintiff's cell, whereupon he began swinging the pipe, striking plaintiff in the back of the head, upper back, and right hand. (Compl. ¶ 11; Borden Affirm. ¶ 4; Blaylock Dep. 81:9-17). Plaintiff attempted to fend off the attack with his hand and, after suffering repeated blows, grabbed Douglas and threw him to the floor. (Compl. ¶ 11; Blaylock Dep. 81:9-82:4).

Alerted by the noise, Officer Borden approached the cell and ordered both men to cease fighting and place their hands on the wall. (Compl. ¶ 12; Borden Affirm. ¶ 4). He did not attempt to physically intervene, but instead activated his radio alarm to request officer assistance. (Compl. ¶ 12; Borden Affirm. ¶ 4; Blaylock 1). After several orders to stop, the inmates complied and placed their hands on the wall. (Compl. ¶ 13; Borden Affirm. ¶ 4; Blaylock 1).

Moments later, Sergeant John Swanson arrived, accompanied by approximately four other officers. (Compl. ¶ 13; Swanson Affirm. ¶ 3). The officers placed both inmates in handcuffs and escorted plaintiff to the infirmary where he was examined by defendant Jane Doe. (Compl. ¶¶ 13-14; Blaylock 1). The examination records specify that plaintiff suffered a swollen lump and a one and a half inch scratch at the back of his head

with "scant" bleeding. (Blaylock 298). Plaintiff was given an ice pack but no x-rays were taken at the time. (Compl. ¶ 15; Blaylock 298).

The day after the altercation, Borden served plaintiff with a misbehavior report charging him with violating DOCS rules 106.10 (failure to follow a direct order); 100.13 (fighting); and 104.13 (creating a disturbance). (Compl. ¶ 16; Borden Affirm. ¶ 7; Blaylock 10). A disciplinary hearing was held on February 8, 2005; Blaylock was the only person to testify -- neither Borden nor Swanson was called as a witness. (Blaylock 41; Borden Affirm. ¶ 7; Blaylock Dep. 140:4-9). At the conclusion of the hearing, the charges were sustained and plaintiff was placed in solitary confinement in the Special Housing Unit (the "SHU") for thirty days. (Compl. ¶ 19; Blaylock 41).

In early March, plaintiff was examined by Dr. John Supple, at which time he complained of pain in the third finger of his right hand. (Compl. ¶ 20; Supple Affirm. ¶ 2; Blaylock 298). Supple gave plaintiff Ibuprofen and, at plaintiff's request, ordered that x-rays be taken of plaintiff's hand. (Compl. ¶ 20; Supple Affirm. ¶ 3; Blaylock 78). Dr. Robert Mueller took the x-rays on March 18 and determined that plaintiff had suffered "no fracture, dislocation or arthritic change, only soft issue swelling." (Supple Affirm. ¶ 3; Blaylock 78).

At some time prior to August 5, 2005, plaintiff appealed the disciplinary ruling against him. (Compl. ¶ 18). On August 5, the ruling was reversed and ordered expunged from the

record.[3] (Id.; Blaylock 34). By that point, however, plaintiff had already completed his thirty days of solitary confinement. (Compl. ¶ 19).

**B.   Procedural History**

Plaintiff commenced this action on June 12, 2006, pursuant to 42 U.S.C. § 1983, alleging that defendants had violated his Eighth and Fourteenth Amendment rights by failing to prevent the assault against him (first count),[4] failing to arrange prompt x-rays of his injured hand (second count), and causing him to be wrongfully disciplined (fourth count). He also asserted a state law claim, alleging that defendants violated New York Correction Law § 137 by failing to provide him with a safe and secure environment (third count). He requested both compensatory and punitive damages.

Defendants moved to dismiss plaintiff's state law claim for lack of subject matter jurisdiction. On February 14, 2007, the Court granted defendants' motion and dismissed the state law

---

[3]   The complaint does not explain why the ruling was reversed. Defendants assert that the ruling was reversed because the tapes of plaintiff's disciplinary hearing "were accidentally destroyed." (See Def. Mem. 4; Blaylock 34, 37)

[4]   The complaint only specifies a Fourteenth Amendment violation with respect to count one. While it is unclear whether plaintiff did so intentionally, the Court evaluates the claim under the Eighth Amendment for it amounts to a challenge to the conditions of his imprisonment. See County of Sacremento v. Lewis, 523 U.S. 833, 842 (1998) ("Where a particular amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.") (citation omitted).

claim. Blaylock v. Borden, No. 06 Civ. 4387 (DC), 2007 WL 486598 (S.D.N.Y. Feb. 14, 2007). The parties thereafter engaged in discovery. This motion for summary judgment followed.

## DISCUSSION

**A. Applicable Law**

**1. Summary Judgment Standard**

Summary judgment is appropriate only where the parties' submissions "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Summary judgment is inappropriate if the Court, resolving all ambiguities and drawing all reasonable inferences against the moving party, finds that the dispute about a material fact is "such that a reasonable jury could return a verdict for the nonmoving party." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

Where a pro se litigant is involved, the court must "read the pleadings of a pro se plaintiff liberally and interpret them 'to raise the strongest arguments they suggest.'" McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994)). Further, "pro se litigant[s] should be given special latitude in responding to a summary judgment motion." Knowles v. New York City Dep't of Corr., 904 F. Supp. 217, 220 (S.D.N.Y. 1995) (citation omitted). Nonetheless, the same standards for summary judgment apply. Id.

2.  **Section 1983**

To prevail on a § 1983 claim, a plaintiff must demonstrate a violation of his constitutional or statutory rights by a person acting under the color of state law. 42 U.S.C. § 1983. To be liable under § 1983, the defendant must have been personally involved in the alleged violation. See Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994); Tolliver v. Wilson, No. 99 Civ. 9555 (JGK), 2000 WL 1154311, at *5 (S.D.N.Y. Aug. 14, 2000). Personal involvement, in this context, means "direct participation, or failure to remedy the alleged wrong after learning of it, or creation of a policy or custom under which unconstitutional practices occurred, or gross negligence in managing subordinates." Black v. Coughlin, 76 F.3d 72, 74 (2d Cir. 1996); see also Wright, 21 F.3d at 501. "Liability may not be premised on the respondeat superior or vicarious liability doctrines, nor may a defendant be liable merely by his connection to the events through links in the chain of command." Prince v. Edwards, No. 99 Civ. 8650 (DC), 2000 WL 633382, *6 (S.D.N.Y. May 17, 2000) (citations omitted).

3.  **Failure to Protect**

Under the Eighth Amendment, which applies to states via the Fourteenth Amendment's due process clause, prison officials must "take reasonable measures to guarantee the safety of inmates in their custody." Hayes v. New York City Dep't of Corr., 84 F.3d 614, 620 (2d Cir. 1996); see also Farmer v. Brennan, 511 U.S. 825, 832 (1994); Knowles, 904 F. Supp. at 221. "Prison

officials have a duty to protect prisoners from violence at the hands of other inmates since being violently assaulted in prison is 'simply not part of the penalty that criminal offenders pay for their offenses against society.'" Lee v. Artuz, 96 Civ. 8604 (JGK), 2000 WL 231083, at *4 (S.D.N.Y. Feb. 29, 2000) (quoting Farmer, 511 U.S. at 834). Nevertheless, "not . . . every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." Farmer, 511 U.S. at 834.

Failure-to-protect claims are treated as challenges to the conditions of confinement. See Lee, 2000 WL 231083, at *3 (citing Edney v. Karrigan, 69 F. Supp. 2d 540, 544 n.1 (S.D.N.Y. 1999)). To prevail, a prisoner must show that, objectively, the conditions of his incarceration posed a substantial risk of serious harm, and, subjectively, that defendants acted with deliberate indifference to that risk. See Farmer, 511 U.S. at 834. In the failure-to-protect context, "a prison official acts with deliberate indifference and thus 'has sufficient culpable intent if he has knowledge that an inmate faces a substantial risk of serious harm and he disregards that risk by failing to take reasonable measures to abate the harm.'" Lee, 2000 WL 231083, at *5 (quoting Hayes, 84 F.3d at 620).

### 4. **Failure to Provide Proper Medical Treatment**

To establish an unconstitutional denial of medical care, a prisoner must prove that prison officials acted with "deliberate indifference to [his] serious medical needs."

Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)).

First, the alleged deprivation of care must be "sufficiently serious" in objective terms. Id. (quoting Wilson v. Seiter, 501 U.S. 294, 298 (1991)). In the Second Circuit, "[a] serious medical condition exists where 'the failure to treat a prisoner's condition could result in . . . the unnecessary and wanton infliction of pain.'" Harrison v. Barkley, 219 F.3d 132, 136 (2d Cir. 2000) (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998)).

Second, the prisoner must "prove that the charged official 'kn[ew] of and disregard[ed] an excessive risk to inmate health or safety.'" Johnson v. Wright, 412 F.3d 398, 403 (2d Cir. 2005) (quoting Farmer, 511 U.S. at 837). Thus, mere negligence will not suffice. Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996). When an inmate complains about a delay in treatment, "it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eight Amendment purposes." Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003).

### 5. Due Process

To prevail on a due process claim in a prisoner discipline case involving solitary confinement, plaintiff must show that he had (1) "'a protected liberty interest in not being confined,'" and (2) "'the deprivation of that liberty interest

occurred without due process of law.'" Sealey v. Giltner, 116 F.3d 47, 51 (2d Cir. 1997) (quoting Bedoya v. Coughlin, 91 F.3d 349, 351-52 (2d Cir. 1996)).

A prisoner suffers a deprivation of a liberty interest if an "atypical and significant hardship" resulted from his confinement. Id. at 52. "[T]he duration of SHU confinement is a distinct factor bearing on atypicality and must be carefully considered." Colon v. Howard, 215 F.3d 227, 231 (2d Cir. 2000) (citing Sealey, 197 F.3d at 586).

The assertion that officers falsely accused a prisoner of a disciplinary infraction, however, does not itself create a due process violation because "[t]here must be more, such as retaliation against the prisoner for exercising a constitutional right." Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997); see also Freeman v. Rideout, 808 F.2d 949, 953 (2d Cir. 1986) (the "filing of unfounded charges d[oes] not give rise to a per se constitutional violation actionable under section 1983."). If there is no claim of retaliation or a constitutionally flawed disciplinary hearing, an "inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." Freeman, 808 F.2d at 951; see also Greaves v. New York, 958 F. Supp. 142, 144 (S.D.N.Y. 1997) ("[T]he failure to conduct a constitutionally adequate disciplinary hearing may give rise to a Section 1983 action, but the mere filing of a false misbehavior report against an inmate does not.").

### B. Application

#### 1. Failure to Protect

##### a. Officer Borden

Plaintiff's claim that Borden violated his Eighth and Fourteenth rights by failing to protect him from Douglas's attack is dismissed. Even assuming that Douglas's attack placed plaintiff at a substantial risk of serious harm, on the record before the Court, a reasonable jury could not find that Borden acted with "the requisite state of mind." No reasonable jury could find that Borden was aware that plaintiff faced a substantial risk of harm or that Borden failed to take reasonable measures to abate that harm.

First, Borden did not witness the dispute in the recreation area. He had no warning that inmate Douglas might attack plaintiff and knew of no previous ill will between them. (Borden Affirm. ¶¶ 8-9). Plaintiff himself asserts that he had no prior relationship with Douglas and, aside from a disagreement one and a half to two years earlier, they had little communication and harbored no substantial animosity toward each other.[5] (Blaylock Dep. 65:20-67:14). Even after the dispute, plaintiff did not advise Borden that he feared for his safety. Indeed, plaintiff testified at his deposition that the dispute

---

[5] Plaintiff notes in his deposition that Douglas had previously complained that plaintiff "was too close to the officers" but that the two inmates very rarely interacted and plaintiff treated him no differently than he treated anyone else. (Blaylock Dep. 65:20-66:19).

had been "so minor" that even as he saw Douglas approach down the hallway, he "didn't think [for] one moment" that Douglas would actually attack him. (Id. 76:23-77:8).

Blaylock has presented no evidence from which a jury could find that Borden was aware that Douglas faced a risk of harm. Indeed, Borden states in his affirmation that "fights are very unusual in the Honor Unit" -- so much so that "inmates are not restricted to their rooms but allowed to freely walk the unit and enter other inmates rooms." (Borden Affirm. ¶ 10). In light of the above, no reasonable jury could conclude that Borden acted with deliberate indifference by failing to prevent Douglas from entering plaintiff's cell.

Second, the undisputed evidence shows that once Borden became aware of the altercation in plaintiff's cell, he took reasonable measures to stop it. By plaintiff's own account, Borden arrived within moments of Douglas's assault.[6] He immediately ordered the men to cease fighting and promptly called for officer assistance. He continued to direct the inmates to stop and place their hands on the wall, until they complied. When Swanson arrived with backup, the officers handcuffed the inmates and escorted plaintiff to the infirmary. None of these facts suggests that Borden failed to take reasonable measures to "abate the harm" caused by Douglas's attack.

---

[6] Borden states, and plaintiff does not dispute, that he only noticed that Douglas was carrying a pipe after the fight in plaintiff's cell had already commenced. (Borden Affirm. ¶ 3).

Plaintiff asserts, however, that Borden failed to take reasonable measures because he "stood off shouting orders for inmate Douglas to stop" instead of attempting to physically subdue him. (Compl. ¶ 12). Furthermore, he adds in his opposition papers, Borden should have prevented Douglas from reaching plaintiff's cell since plaintiff had notified Borden of the argument in the recreation room prior to the attack.[7] Neither argument suffices to raise an issue of fact.

First, the assertion that Borden acted improperly by calling for officer assistance instead of jumping into the fight himself is itself unreasonable. Borden was alone with two inmates, one of who had a weapon.[8] (Borden Affirm. ¶ 4). In their affirmations, he and Swanson state that prison officials receive specific training to request assistance and await sufficient backup before physically intervening in an inmate fight "to ensure the safety and security of the inmates and officers." (Borden Affirm. ¶ 6; Swanson Affirm. ¶ 6). Blaylock has not disputed these statements. Considering that Borden's actions -- arriving promptly on the scene, calling for immediate assistance, and ordering the men to place their hands on the wall -- are in line with the officers' safety protocol, plaintiff's contention that Borden acted with deliberate indifference fails

---

[7] Borden denies that plaintiff informed him about the dispute in the recreation room prior to the fight in plaintiff's cell. (Borden Suppl. Affirm. ¶ 1).

[8] Borden states that he was not carrying a baton and that, as batons were optional, most officers at Fishkill did not carry them. (Borden Suppl. Affirm. ¶ 2).

as a matter of law.  See Trammell v. Keane, 338 F.3d 155, 163 (2d Cir. 2003) (no deliberate indifference where actions were "reasonably calculated to restore prison discipline and security").

Second, even assuming that plaintiff informed Borden about the dispute in the recreation area, he concedes that he gave Borden no indication that it warranted any further concern. To the contrary, by plaintiff's account, he told Borden, "Everything is taken care of.  Nothing for me to tell you about.  It was just a small incident I had.  That is all." (Blaylock Dep. 84:11-14).  Certainly these words, and plaintiff's own surprise at the attack, undermine the notion that he put Borden on notice of the danger that he faced.  In his opposition, plaintiff suggests that Borden should have known better than to take plaintiff's assessment of the risk as authoritative.  (See Pl. Opp. 10).  On the record before the Court, however, no reasonable jury could find Borden liable on that basis. Accordingly, the failure-to-protect claim against Borden is dismissed.

### b. Sergeant Swanson

The failure-to-protect claim against Officer Swanson fails as well.  Officer Swanson arrived at the cell, in plaintiff's words, "seconds after" the inmates had complied with Borden's orders to put their hands on the wall.  (Compl. ¶ 13). Plaintiff does not contend that Swanson was tardy in responding or failed to provide sufficient assistance in detaining Douglas.

Instead, he alleges in his opposition that Swanson is liable because he was Borden's immediate supervisor and "had full knowledge that [H]ousing [U]nit 21 . . . was not sufficiently staff[ed] on February 4" and yet failed to temporarily assign a second officer to the area.[9]  (Pl. Opp. 10, 15).  This does not suffice.

First, Swanson's status as Borden's supervisor does not, by itself, provide grounds for liability.  See Prince, 2000 WL 633382 at *6.  Second, plaintiff provides insufficient facts for a jury to conclude that Swanson knew the unit was understaffed that night yet deliberately failed to take proper action.  Plaintiff alleges that Swanson's job description required him to inspect all the units under his supervision.  (See Pl. Opp. 15).  He offers no evidence, save the second-hand assertions of inmates from other units, that proper protocol required Swanson to place a second officer on duty to inspect the housing unit.[10]  Even assuming that it was common practice in the Honor Unit to post two officers on site during the early evening, the record contains no evidence that Swanson knew or had reason

---

[9] In opposing summary judgment, plaintiff also includes affidavits from two former inmates who resided in other units and assert that based on their general observations and conversations with other inmates, they "knew that all of the housing units were staffed with two officers at all times."  (See Pl. Opp. Exs. F, G).

[10] Defendants contend (and provide a job description to support the contention) that between 6:00 and 9:15 PM, the second officer on duty is generally posted to the package room, leaving one officer at the housing unit.  (Borden Suppl. Affirm. ¶ 3; Swanson Suppl. Affirm. ¶ 1; see Correction Officer Form).

to know that defendant faced a substantial risk of harm, let alone deliberately disregarded that risk. Accordingly, plaintiff's claim against Swanson fails as a matter of law and is dismissed.

2. **Deliberate Indifference to Medical Needs**

    a. **Dr. Supple**

Plaintiff's claim that Supple violated his constitutional rights by failing to provide proper medical care is dismissed. Plaintiff's conclusory allegation that "Supple failed to take proper and minimal medical care in his treatment of plaintiff" by not transporting him to a hospital or medical facility for prompt x-rays fails to establish liability.

First, plaintiff fails to provide evidence from which a reasonable jury could conclude that he suffered a serious deprivation of care with respect to his hand. Dr. Supple examined plaintiff at the beginning of March and, on the same day, placed an order for x-rays of plaintiff's right hand.[11] That x-ray, taken on March 18, revealed "no fracture, dislocation or arthritic change." (Supple Affirm. ¶ 3; Blaylock 78). Even assuming that Supple could have expedited the process by sending plaintiff to an outside facility, as a matter of law, Supple did

---

[11] In his complaint, plaintiff states that he visited Dr. Supple on March 3; his opposition papers state that Supple examined him on March 1. (Comp. ¶ 20; Pl. Opp. 14). The "Request for Radiological Examination" is also dated March 1 (Blaylock 78; see Supple Affirm. ¶ 2). These difference are minor as the parties do not dispute that the x-ray was not taken until March 18.

not cause a delay of medical care that placed defendant at risk because the x-ray results indicated that plaintiff suffered "no acute bone injury." (Blaylock 78).

Second, even assuming plaintiff's injury was "sufficiently serious" to support a 1983 claim, there is no evidence that Supple acted with deliberate indifference. Supple ordered an x-ray of plaintiff's hand even though he "doubted that there was a fracture." (Supple Affirm. ¶ 2; see Blaylock 298). The x-ray results likewise revealed no fracture. These facts do not indicate that Supple knew plaintiff faced a risk but deliberately failed to act upon it. To the contrary, the undisputed facts show that Supple doubted that plaintiff faced a risk, but acted nonetheless.

Plaintiff asserts in his opposition papers that a 2007 MRI of his hand revealed nerve damage and that this further establishes Supple's liability. (See Pl. Opp. 13-14 & Exs. A-C). It does not. While it is possible that plaintiff suffered additional, previously undetected injuries, the focus of the Court's inquiry is not the seriousness of plaintiff's injuries in the abstract, but whether the alleged deprivation of care placed plaintiff at substantial risk of harm. Here, there is no suggestion that the timing of plaintiff's x-ray had any connection to plaintiff's risk for nerve damage nor any evidence that Supple knew that defendant faced that risk but acted with indifference to it. Accordingly, plaintiff's claim that Supple

violated his constitutional rights by acting with deliberate indifference to his medical needs is dismissed.[12]

### b. Officer Borden and Sergeant Swanson

The medical indifference claims against Borden and Swanson are also dismissed because plaintiff provides no basis to support them. The officers had plaintiff escorted to the infirmary for a medical examination after his fight with Douglas. They were neither medical officials nor in charge of deciding the type of treatment he should receive. Nonetheless, plaintiff asserts that rather than simply taking him to the infirmary, they "should have demanded that plaintiff be given a full examination consistent with his injuries." (Pl. Opp. 15). This argument fails -- plaintiff provides no reason for the Court to assume that the medical staff required the officers' direction to conduct an appropriate examination. The medical indifference claims against Borden and Swanson are thereby dismissed.

### 3. Due Process

Plaintiff's claim that Borden and Swanson violated his due process rights by causing him to be wrongfully disciplined is also dismissed. The parties generally agree on the key sequence of events that unfurled in plaintiff's cell: Borden arrived to

---

[12] The complaint makes no factual allegations against defendant Jane Doe, save to mention that she "ignored his visible injuries" along with Borden and Swanson. (Compl. ¶ 8). Plaintiff makes no further mention of her in his opposition. To the extent he brings a medical indifference claim against Jane Doe, it is dismissed as well, for no reasonable jury could find a basis for holding her liable.

find the inmates engaged in a physical altercation, with Douglas wielding a metal pipe, and promptly requested assistance and ordered the men to place their hands on wall.  Even assuming that the officers were "in receipt of sufficient information that plaintiff had not initiated, nor provoked the assault upon his person," and failed "to sufficiently and truthfully inform the hearing officer," as a matter of law, they did not cause plaintiff to suffer a deprivation without due process.

First, neither officer was called to testify at plaintiff's disciplinary hearing, rendering the allegation that they failed to "truthfully inform the hearing officer" misleading.

Second, even assuming the misbehavior report was "false" because it did not indicate that plaintiff was not the initial aggressor, it did not violate Blaylock's due process rights.  A false accusation does not, on its own, constitute a due process violation.  Boddie, 105 F.3d at 862; Freeman, 808 F.2d at 951.  Plaintiff does not allege that Borden issued the misbehavior report as a retaliatory act nor does he claim a constitutional flaw in the disciplinary proceedings.  He only asserts that Borden and Swanson "were in receipt of sufficient information indicating plaintiff had not initiated, nor provoked the assault . . . yet allowed him to be punished." (Compl. ¶ 30).  Because plaintiff was granted a hearing, and was afforded the opportunity to rebut the charges against him, the charges, even if false, did not give rise to a per se constitutional

violation actionable under 1983. Freeman, 808 F.2d at 953. As plaintiff alleges no other deficiency in his disciplinary hearing, he fails to provide sufficient facts to withstand summary judgment with respect to his wrongful discipline claim.[13]

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted and plaintiff's claims are dismissed. The Clerk of the Court shall enter judgment dismissing the complaint, with prejudice but without fees or costs.

SO ORDERED.

Dated: New York, New York
April 16, 2008

DENNY CHIN
United States District Judge

---

[13] Plaintiff's claim also fails because, in general, a thirty-day confinement under normal SHU conditions does not constitute an atypical, significant hardship implicating a protected liberty interest. See Palmer v. Richards, 364 F.3d 60, 65 (2d Cir. 2004); Liptschen v. Pollock, No. 93 Civ 6585 (DC), 1996 WL 412019, at *3 (S.D.N.Y. July 22, 1996). While even short confinements may constitute atypical hardships "if the conditions were more severe than the normal," Palmer, 364 F.3d at 65, plaintiff makes no allegation, and the record contains no evidence to show, that he faced abnormal SHU conditions.